*Paige v. State of Vermont*, 167-9-17 Oecv (Harris, J., Mar. 16, 2018)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                             CIVIL DIVISION
Orange Unit                                       Docket No. 167-9-17 Oecv


H. BROOKE PAIGE,
        Plaintiff

v.

THE STATE OF VERMONT; THE
VERMONT BOARD OF EDUCATION;
VERMONT SECRETARY OF
EDUCATION, REBECCA HOLCOMBE;
SECRETARY OF STATE, JAMES
CONDOS; and THE WASHINGTON
TOWN SCHOOL BOARD,
        Defendants


## DECISION ON MOTION TO DISMISS


Plaintiff H. Brooke Paige is a resident and taxpayer of Washington, Vermont. Am. Compl. ¶ 1. In May 2017, Washington residents voted to merge the Washington school district with the neighboring town of Orange pursuant to Act 46, a 2015 legislative enactment that incentivizes school mergers. *Id*. ¶ 17. Thereafter, Plaintiff filed an unsuccessful complaint with the Secretary of State, arguing that Act 46 coerced local voters to support the school merger. *Id*. ¶¶ 18–19. He has filed this action appealing that complaint and making several statutory and constitutional claims relating to Act 46, naming as Defendants the State of Vermont, the Vermont Board of Education, the Vermont Secretary of Education, the Vermont Secretary of State, and the Washington Town School Board. All of the Defendants except the Washington School Board (hereinafter, "Defendants") now move to dismiss Plaintiff's complaint, arguing that Plaintiff lacks standing and has failed to state a claim for which relief may be granted.

Plaintiff is proceeding *pro se*, and Defendants are represented by Philip Back of the Vermont Attorney General's Office.

Act 46 is an effort by the Vermont Legislature to reform the governance structures of Vermont schools so that smaller schools "have the opportunity to enjoy the expanded educational opportunities and economies of scale" that are available to larger schools. 2015, No. 46, §§ 2–3. To achieve this goal, the Act establishes a multi-year process with incentives for communities to voluntarily merge into preferred governance structures identified by the State. See *id*. § 6 (mergers before July 2016 receive decreased homestead property tax rate, merger support grant, and transition facilitation grant); *id*. § 7 (mergers becoming operational between July 2017 and July 2019 receive decreased homestead property tax rate and merger support grant); § 10 (by June 2018, Secretary of Education shall propose to State Board of Education a plan to move remaining districts "into the more sustainable, preferred model of governance" as set forth in § 5). Plaintiff argues that Act 46 violates the Education Clause, Chapter II, § 68 of the Vermont Constitution, the right to equal educational opportunities as enunciated in *Brigham v. State*, 166 Vt. 246 (1997) (per curiam) (*Brigham I*), and impermissibly coerces voters to vote for school merges in violation of various federal and state election laws. See Am. Compl. ¶ 71.

Discussion

I.    Standing

As a threshold matter, Defendants argue that Plaintiff lacks standing, maintaining that the claims in this case do not present a real controversy involving a threat of actual injury to Plaintiff's protected legal interests. See Mot. to Dismiss at 8. Defendants note that although Plaintiff is a taxpayer in Washington, Vermont, he is neither a student nor parent of a student enrolled in a school affected by Act 46. *Id*. at 10. Defendants claim that Plaintiff has not alleged

2

that Act 46 has caused his taxes to be disproportionately higher than those of similarly situated taxpayers in another town. *Id.*

Plaintiff does assert that "while the merger is a significant benefit to the citizens of Orange, those benefits are accrued at the expense of the citizens of Washington. Subjecting the Washingtonians to higher education costs and school taxes . . . loss of town ownership of the Washington Village School, [and] responsibility for the rehabilitation of the Orange Village School . . . ." Am. Compl. ¶ 16. To support this contention, Plaintiff cites to his own "Informational Pamphlet on Orange/Washington Merger." See Pl.'s Ex. 8. That informational pamphlet argues that Washington residents would shoulder a disproportionate burden under a merger between Orange and Washington schools. *Id.* Specifically, Plaintiff claims that the Washington school business manager stated that Orange and Washington would equally share the cost of education under a merger, and Orange's school budget is currently about $350,000 greater than Washington's. *Id.* Accordingly, an even split between the towns would result in Washington taxpayers accounting for about half of the greater expenses currently incurred only by Orange. *Id.*

Plaintiff reiterates this point in his response, stating that the FY 19 Orange/Washington Union School District Budget Report confirms that Washington residents will shoulder an increased burden as a result of the merger because of the higher educational costs in Orange. See Pl.'s Reply to Mot. to Dismiss, ¶¶ 42–44. Plaintiff also alleges that as a result of the merger, Washington taxpayers will be responsible for a portion of specific school debts incurred by Orange. See *id.* ¶ 44.

To satisfy the standing requirement, a plaintiff must show: (1) injury-in-fact, (2) causation, and (3) redressability. *Brigham v. State*, 2005 VT 105, ¶ 16, 179 Vt. 525 (*Brigham*

3

*II*).  "Thus, the plaintiff must allege a personal injury traceable to the defendant's conduct that the court can remedy by granting the sought-after relief."  *Id.*  "An injury in fact must be reasonably expected and not based on fear or anticipation."  *Brod v. Agency of Nat. Res.*, 2007 VT 87, ¶ 9, 182 Vt. 234 (citing *Robtoy v. City of St. Albans*, 132 Vt. 503, 504 (1974)).  "Plaintiffs must be directly affected by a government action, rule or law in order to have standing to challenge it."  *Id.* ¶ 13 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992)).

In *Brigham II*, a group of taxpayers alleged that they paid "disproportionately high state and local education taxes compared to similarly situated taxpayers of other Vermont towns," and that "they are forced to pay higher education taxes than other taxpayers who own property of the same value and have identical adjusted gross incomes."  *Brigham II*, 2005 VT 105, ¶ 3.  The taxpayers alleged that the Act in question violated their constitutional right to be taxed the same as other similarly situated taxpayers under the Proportional Contribution Clause of the Vermont Constitution.  *Id.* ¶ 15.  The Court concluded that the taxpayers had standing to challenge the disproportionate taxation under the Act and that the plaintiffs' injuries will be redressed if the court declared the Act unconstitutional.  *Id.* ¶ 17.  In this case, Plaintiff does not allege that Act 46 causes disproportionately high taxes compared to similarly situated taxpayers under the Proportional Contribution Clause.  Rather, he alleges that he and other Washingtonians will face a greater financial burden overall after the proposed school merger with the Town of Orange because of the additional costs associated with the Orange school.  Accordingly, the only cognizable basis for Plaintiff's standing is his status as a Washington taxpayer in light of the additional financial burden on Washington residents as a result of the merger.

Vermont has long recognized standing in taxpayer suits against municipalities.  See, e.g., *Cent. Vermont Pub. Serv. Corp. v. Town of Springfield*, 135 Vt. 436, 438 (1977) ("In Vermont,

4

taxpayer's suits have long been recognized as appropriate vehicles for seeking relief from official action."); *Baird v. City of Burlington*, 2016 VT 6, ¶ 21, 201 Vt. 112. Taxpayer standing requires some direct loss or a showing that municipal assets have been improperly wasted. *Baird*, 2016 VT 6, ¶ 21. However, "whether a plaintiff has standing in his capacity as a taxpayer turns largely on the sovereign whose act he challenges." *Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State Teachers Ret. Sys.*, 60 F.3d 106, 110 (2d Cir. 1995). Courts distinguish between taxpayer suits against municipalities and suits against the state or federal government:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate . . . But the relation of a taxpayer of the United States to the federal government is very different. His interest in the moneys of the treasury . . . is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

*Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923). This principle extends to state taxpayers. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) ("The foregoing rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers.").

When a state taxpayer seeks to attack a state statute and not just a municipality's expenditures, he or she must demonstrate "not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Doremus v. Bd. of Ed. of Borough of Hawthorne*, 342 U.S. 429, 434 (1952). The taxpayer must show a "good-faith pocketbook action" such that he or she has a "direct and particular financial interest." *Id*. at 434–35. This direct and particular interest must be more

"than the mere payment of taxes." *Bd. of Educ. of Mt. Sinai Union Free Sch. Dist.*, 60 F.3d at 110.

At this stage in the proceeding, the Court accepts as true the allegations in Plaintiff's complaint. See *Brigham II*, 2005 VT 105, ¶ 15 (*accepting plaintiffs' allegations of disproportionate tax burden at motion to dismiss stage*). Plaintiff has alleged specific figures regarding the pre- and post-merger school budget obligations for Washington residents showing a specific financial burden on Washington residents as a result of the proposed Washington/Orange merger. The Court believes that this burden represents a sufficiently "direct and particular interest" that confers standing to Plaintiff. Defendants do not contest that the merger vote was "prompted" by the passage of Act 46. See Mot. to Dismiss at 3. Accordingly, the increased financial burden resulting from the school merger is "fairly traceable" to the passage of Act 46. See *Parker v. Town of Milton*, 169 Vt. 74, 78 (1998). The Court must also be able to redress the injury. *Id*. at 77. The merger process up until this point has occurred pursuant to Act 46's requirements. If the Court found Act 46 unconstitutional, this would effectively halt Washington's merger process under the Act and relieve the town from the financial obligations associated with the merger. Thus, the Court finds that Plaintiff has standing to challenge Act 46.

II.     Failure to State a Claim: Education Clause

Next, Defendants argue that Plaintiff has failed to state a claim that Act 46 violates the Education Clause. See Vt. Const. Ch. II, § 68; Mot. to Dismiss at 8–12. Plaintiff argues that "the historic traditions of Vermont and legal precedents of her Courts clearly rest on the side of 'local control' as expressed in the Vermont Constitution's Virtue and Education Clause." Am. Compl. at 69. He states that "[t]he merger resulting from the Act 46 Election will subject [Washintonians] to [] loss of the rights and responsibility relating to the education of the youth of

6

the Town of Washington (rights and obligations guaranteed under the Vermont Constitution – Chapter 2, § 68) . . . .”).  *Id*. at 61; see also *id*. at 12 (stating that § 68 “assigns the sole responsibility of the Education decisions for the town’s ‘youths’ to citizens of the town in which they reside and the officials the citizens select to serve on their local School Board”).

The purpose of a motion to dismiss for failure to state a claim is “to test the law of the claim, not the facts which support it.”  *Brigham II*, 2005 VT 105, ¶ 11, 179 Vt. 525 (quoting *Powers v. Office of Child Support,* 173 Vt. 390, 395 (2002)).  To evaluate the argument, the Court assumes the allegations in the complaint are true.  *Id*.  “To sustain dismissal, the court must have no doubt that the alleged facts, if proven, would not entitle the plaintiff to relief under any legal theory.”  *Id*. (citing *Gilman v. Maine Mut. Fire Ins. Co.,* 2003 VT 55, ¶ 14, 175 Vt. 554 (mem.)); see also *Richards v. Town of Norwich*, 169 Vt. 44, 48–49 (1999) (“A motion to dismiss for failure to state a claim . . . should not be granted unless it is beyond doubt ‘that there exist no facts or circumstances that would entitle the plaintiff to relief.’” (quoting *Amiot v. Ames,* 166 Vt. 288, 291 (1997)).  For the following reasons, the Court agrees with Defendants that Plaintiff has failed to state a claim that Act 46 violates the Education Clause.

As an initial matter, Defendants argue that the Education Clause is not self-executing and therefore does not provide Plaintiff with a private right of action.  Mot. to Dismiss at 12.  A self-executing constitutional provision provides a private right of action, whereas a provision that is not self-executing requires some implementing legislation to become operative.  *Shields v. Gerhart*, 163 Vt. 219, 222 (1995).  For example, the Court has found that Article 13’s free speech right is self-executing, whereas the general right to possess property and pursue happiness is not.  *Id*. at 227.

7

"A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, . . . and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." *In re Town Highway No. 20*, 2012 VT 17, ¶ 29, 191 Vt. 231 (quoting *Davis v. Burke*, 179 U.S. 399, 403 (1900)). In considering whether a constitutional provision is self-executing, the Court considers several factors:

> First, a self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection. Ordinarily a self-executing provision does not contain a directive to the legislature for further action. The legislative history may be particularly informative as to the provision's intended operation. Finally, a decision for or against self-execution must harmonize with the scheme of rights established in the constitution as a whole.

*Shields*, 163 Vt. at 224.

The Education Clause states that "a competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth." Vt. Const. Ch. II, § 68. The Court considered the Education Clause at length in *Brigham I*, concluding that a competent number of schools ought to be maintained is a "binding and enforceable obligation[] upon the state," and not merely an "aspirational ideal[]." *Brigham I*, 166 Vt. at 262. The duty to educate is a "fundamental obligation" of the state, rejecting the argument that education was not an "individual right." *Id*. at 262–63. Accordingly, the Education Clause does "more than express only general principles," *In re Town Highway No. 20*, 2012 VT 17, ¶ 29, but rather creates a constitutional right to public education, *Brigham I*, 166 Vt. at 263; *Ouimette v. Babbie*, 405 F. Supp. 525, 529 (D. Vt. 1975). The Clause does not contain a directive for further action, but rather permits alternative means for the legislature to reach its constitutional obligations. Vt. Const. Ch. II, § 68 ("[*U*]*nless* the general assembly permits other

8

provisions for the convenient instruction of youth." (emphasis added)). Its history, as recounted in *Brigham I*, clearly creates a specific constitutional obligation. See *Brigham I*, 166 Vt. at 262–63. And enforcing the right to education is generally consistent with the "scheme of rights" established in the constitution. See *Shields*, 163 Vt. at 224; *Brigham I*, 166 Vt. at 262. Accordingly, the Court finds that the Education Clause is self-executing to the extent that a party seeks to enforce the constitutional obligation it creates.

Nevertheless, the Court finds that Plaintiff has failed to state a claim under the Education Clause. *Brigham I* recounts the history of the Education Clause in a similar manner to Plaintiff's historical review in his Amended Complaint. Contrary to Plaintiff's conclusion, however, the Court squarely held that the state of Vermont, through the Legislature—and not Vermont towns and cities—has the constitutional authority and obligation to implement the right to education. "The *Legislature* has implemented the education clause by *authorizing* school districts to raise revenue through local property taxes." *Brigham I*, 166 Vt. at 259 (emphasis added). It is the "*state's* duty to ensure" the proper dissemination of education, a "fundamental obligation of the *state*." *Id*. at 262–63 (emphasis added). "The constitution of the State especially enjoins upon *the legislature* the duty of passing laws to carry out" its obligation to educate the state's children. *Id*, citing *Williams v. School District No. 6*, 33 Vt. 271, 274-75 (1860)(emphasis added).

The Court recognized that there is a "long and settled history" that education is a "fundamental obligation of *state government*." *Id*. at 264 (emphasis added)[1]. In response to the argument that the towns have a constitutional responsibility for education, the Court said that this argument "fundamentally misunderstands the state's constitutional responsibility . . . for public education." *Id*. Although "the *state* may *delegate* to local towns and cities the authority to

---

9

finance and administer the schools within their borders," the fundamental constitutional responsibility rests with the state. *Id*. at 264 (emphasis added). Although school officials may have acquired "more and more" power over time, this is a result of state statutes—not the school officials' inherent authority. *Buttolph v. Osborn*, 119 Vt. 116, 119 (1956). Accordingly, from these state statutes, "[i]t was made clear that education is a function of the state as distinguished from local government." *Id*.

In light of these cases, the Education Clause does not create a constitutional right for "local control" of education by towns and cities. See Am. Compl. at 61, 69. Rather, the Clause explicitly provides for the *general assembly* to control "provisions for the convenient instruction of youth." Vt. Const. Ch. II, § 68. The Clause's history, as recounted in *Brigham I*, clearly rests the constitutional obligation for educating Vermont's youth with the state, and not towns and cities. See *Brigham I*, 166 Vt. at 262–63. Accordingly, the Court concludes that Plaintiff has failed to state a claim that Act 46 violates the Education Clause by usurping local control of education.

Plaintiff also asserts that the employees of the Agency of Education "spoon-fed" the Legislature the framework and "verbiage" of Act 46. See Am. Compl. at 34–35. He states that particular agency employees had "excessive involvement" in the process to develop the Act. *Id*. at 35. Plaintiff alleges that the Legislature allowed the AOE staff to substitute themselves for the Education Committee members. *Id*. The Court will not infer a separation of powers claim from allegations of coordination between the Legislature and an administrative agency when drafting legislation. There is a presumption that legislative action is taken in good faith and in accordance with constitutional standards. *State v. Ludlow Supermarkets, Inc.*, 141 Vt. 261, 267 (1982). The separation of powers requirement is a "relatively forgiving standard" that is

10

"tolerant of such overlapping institutional arrangements short of one branch virtually 'usurping' from another its constitutionally defined function." *Hunter v. State*, 2004 VT 108, ¶ 21, 177 Vt. 339 (quoting *State v. Nelson,* 170 Vt. 125, 128 (1999)). The practical demands of governance necessarily require "a certain amount of overlapping or blending of the powers." *State v. Nelson*, 170 Vt. 125, 127, 742 A.2d 1248, 1250 (1999) (quoting *In re D.L.*, 164 Vt. 223, 229 (1995)). Given these principles, the Court cannot infer a separation of powers claim from the allegations of Plaintiff's amended complaint. Accord, *Powder River County v. State of Montana*, 2002 MT 259, ¶¶ 115 – 188, 60 P.3d 357, 381 (Mont. 2002) (participation of the state Commissioner, for the Montana Department of Revenue, in researching and drafting a new tax law, creating a local government severance tax on certain natural resource extraction industries' proceeds, to provide funding for public schools, did not violate the separation of powers provisions of the Montana State Constitution or the United States Constitution).

III. Failure to State a Claim: Common Benefits Clause

Next, Defendants assert that Plaintiff has failed to state a claim that Act 46 violates the "principles of equality" established by *Brigham I*. See Mot. to Dismiss at 16; Am. Compl. at 70–71. Plaintiff claims that Act 46 violates the Common Benefits Clause because Act 46's financial incentives will serve to "create further disparities in the finances of the various school districts thus affecting the equality of educational outcomes" required under *Brigham I*. Am. Compl. at 48. Defendants contend that Plaintiff's claim regarding Act 46's effect on equal educational opportunities is "premature and speculative," similar to the claims in *Anderson v. State*, 168 Vt. 641 (1998). Mot. to Dismiss at 16. The Court agrees that Plaintiff's claim, like that in *Anderson*, is too premature and speculative to state a claim under *Brigham I*.

11

The Common Benefits Clause ensures "*substantial* equality of educational opportunity throughout Vermont." *Brigham I*, 166 Vt. at 268 (emphasis in original). In *Brigham I*, the Court found "gross inequities in educational opportunities" in the existing school funding system that discriminated in the "distribution of a constitutionally mandated right" to education. *Id*. at 265, 267. One year after *Brigham I*, students challenged Act 60, which sought to implement *Brigham I* by instituting various equalization measures to account for the disparity of education spending. See *Anderson*, 168 Vt. at 642 (outlining specific measures in Act 60). Act 60 contained transition provisions that had yet to be fully implemented at the time. *Id*. at 643. Plaintiffs from a property-wealthy school district challenged the Act by claiming an inability to obtain equal education opportunity because the Act would redistribute some of their funds to property-poor districts. *Id*.

The Court concluded that the plaintiffs' claims were too speculative to create an actual controversy, and any decision by the court would be "merely an advisory opinion." *Id*. at 644. The Court reiterated that "*absolute* equality of funding is neither a necessary nor a practical requirement," and that *Brigham I* did not require this result. *Anderson*, 168 Vt. at 644. At most, the Court explained, the Act imposed "certain obligations on taxpayers that differ from their obligations under the previous school funding formula." *Id*. In a similar suit a year later, the Court reached the same conclusion. See *Stowe Citizens for Responsible Gov't v. State*, 169 Vt. 559 (1999) (mem.). The Court held that "[a]s in *Anderson,* we decline plaintiff's invitation to consider invalidating Act 60 based on predictions that future events will demonstrate the statute's failure to fulfill the State's constitutional obligations." *Id*. at 561.

Plaintiff argues that Act 46 will elevate aid to those districts that comply with the Act, while financially punishing those that wait. Am. Compl. at 48. This will "create further

disparities in the finances" of the various school districts. *Id.* Although Act 46 may impose certain obligations on municipalities that differ from prior school governance requirements, this alone does not amount to a violation of equal educational opportunity under *Brigham I*. Like *Anderson*, *supra* and *Stowe Citizens for Responsible Growth, supra*, Plaintiff's claims are too speculative to create an actual controversy under *Brigham I*, and any decision by this Court would merely be an advisory opinion. Accordingly, the Court finds that Plaintiff has failed to state a claim that Act 46 affects the constitutional right to equal educational opportunity.

IV.     Act 46 Voter Coercion

Plaintiff next claims that Act 46's financial incentives impermissibly coerce voters to support Act 46's preferred merger policy. See Am. Compl. at 11, 71. Plaintiff posits whether the "coercive penalties and financial inducements proscribed in Act 46 unduly and unlawfully influence the voters in the Elections required under Act 46 to decide the questions of local school mergers." *Id.* at 12. Plaintiff analogizes the Act's financial incentives to "threats, coercion and bribery." See *id.* at 49. He alleges that the Merger Committee failed to fully investigate alternative avenues because of these incentives. *Id.* at 51. Plaintiff asserts that Act 46 effectively coerced voters to support the merger in violation various state and federal election laws and two constitutional provisions. *Id.* at 71. Defendants contend that Plaintiff has failed to state a claim under any of the provisions cited by Plaintiff. See Mot. to Dismiss at 18. The Court agrees with Defendants that the provisions cited by Plaintiff are inapplicable to his claim. See Mot. to Dismiss at 18–26. A brief review of the cited statutes suffices to show their inapplicability, and a review of the constitutional claim shows that Plaintiff has failed to state a claim that Act 46 impermissibly coerced voters.

13

Plaintiff asks the Court to invalidate the school merger vote, citing Ch. 1, Art. 8 and 18 of the Vermont Constitution. Vt. Const. Ch. I, art. 8. Article 18 states:

> That frequent recurrence to fundamental principles, and a firm adherence to justice, moderation, temperance, industry, and frugality, are absolutely necessary to preserve the blessings of liberty, and keep government free; the people ought, therefore to pay particular attention to these points, in the choice of officers and representatives, and have a right, in a legal way, to exact a due and constant regard to them, from their legislators and magistrates, in making and executing such laws as are necessary for the good government of the State.

The Court agrees with Defendants that the verbiage of Article 18, regarding the "fundamental principles . . . [of] justice, moderation, temperance, industry, and frugality …. to preserve the blessings of liberty," "is but a truism" and therefore "provides no private right of action" in and of itself. *Welch v. Seery*, 138 Vt. 126, 128 (1980); see also *Shields v. Gerhart*, 163 Vt. 219, 224 (1995) (finding that constitutional provision is not self-executing and does not support a private right of action when "it is evident that this provision expresses fundamental, general principles, principles that infuse the rights of individuals and powers of government specified elsewhere in the constitution").

In *Bieling v. Malloy*, 133 Vt. 522 (1975), plaintiff's claim of a violation of Chapter II, Article 18 was presented to the Vermont Supreme Court as part of one of four certified questions in a taxpayer challenge over a Title 23 state statute that allowed for suspension of driving licenses for persons who failed to pay poll taxes. The Supreme Court found the statutory taxing scheme to be lawful (as the court has done here with Act 46), and answered the certified question in the negative, finding no constitutional violations. The *Bieling* Court did not expressly discuss Article 18, or whether it conveyed any private right. It is not clear if the Court believed the clause gave no private claim right on taxing matters or if the clause had no application to a reasonable statutory scheme, such as Act 46, which finds its constitutional grounding in Chapter

14

II's Section 68, described above.  Similarly, in *Benning v. State*, 161 Vt. 472, 480 (1994) a citizen and motorcyclist challenged the constitutionality of the Vermont mandatory motorcyclist head gear law during his prosecution of a violation of the statute.  Although the Plaintiff claimed a violation of Chapter II, Article 18, with little discussion the Court found the section provided no special protections for the plaintiff and rejected the claims.

If the court assumes that Chapter II Article 18 was "self -executing", standing alone it does not convey sufficiently clear enforceable rights on it own, at least in the area of taxation challenges. See *Bieling*, 133 Vt. 522.  This court, drawing upon a 1911 case, has ruled that Chapter I, Article 18, when coupled with Chapter II, Section 39[2], can create a right, based in the Vermont constitution, when  "read together to prohibit all cruel and unusual punishments" for inmates. See *Godin v. Corrections Corp. of America*, No. 364-10-16Frcv, 2017 WL 7052186, at *13-14 (8/25/17/(Harris, J.) (citing *State v. Burlington Drug Co*., 84 Vt 243, 249-50 (1911)).   In accepting the linked private cause of action, this court heavily relied on the provisions of Section 39. The court noted Section 39 "appears to state more than mere general principles, and sets forth a specific right in that 'all fines shall be proportioned to the offences'" and "[t]hus, to the extent that Section 39 sets forth a specific right, that right is fully fleshed out by its being read in concert with Article 18."

Here there is no such other state constitutional provision to couple with Section 18 to provide a private cause of action.  Chapter II, Article 68, as interpreted in *Bingham I* demonstrates the state constitution expressly gives the legislature considerable latitude in the manner in which it meets its duty to provide for education in structuring town school systems.

---

[2]  Chapt. II, Section 39 states, "[a]ll prosecutions shall commence, By the authority of the State of Vermont. All Indictments shall conclude with these words, against the peace and dignity of the State. And all fines shall be proportioned to the offences"

Nor has Plaintiff shown the court there is some other provision of the Vermont constitution relating to elections, which provides sufficiently clear rights so it may be "coupled" with Article 18 to give a private cause of action under the facts alleged in the Amended Complaint.

Article 8 states that all elections shall be "free and without corruption." In general, the Constitution protects the right of citizens to vote in elections and have their vote counted without debasement or dilution. See *Putter v. Montpelier Pub. Sch. Sys.*, 166 Vt. 463, 468 (1997) (citing federal constitutional voter protections). Accordingly, invalidation of an election "requires more than merely a claim of election irregularity, even one of constitutional dimensions." *Daims v. Town of Brattleboro*, 2016 VT 55, ¶ 17, 202 Vt. 276 (quoting *Putter*, 166 Vt. at 468). In *Daims*, the plaintiffs argued that a town select board impermissibly distributed an informational sheet advocating for a particular position on a local vote. See *id*. ¶ 15. The Court affirmed summary judgment to the town, holding that "ordering a reelection is an extraordinary remedy that is available only in extreme circumstances in which the right to vote was affected." *Id*. ¶ 17; compare *Abbott v. Gordon*, No. CIV.A. 04C-09-055PLA, 2008 WL 821522, at *20 (Del. Super. Ct. Mar. 27, 2008), *aff'd,* 957 A.2d 1 (Del. 2008) (finding that violation of Delaware constitutional provision analogous to Article 8 required showing of impediment to access polls) with *Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, 767 (Del. Ch. 2017) (finding that school district's election day events at polling places operated as impediments to voting; "when widespread electioneering interferes with voters' ability to access the polls, the election has not been 'free and equal' for purposes of the Elections Clause").

In this case, Plaintiff does not allege that Act 46's financial incentives affected voters' ability to access the polls. Plaintiff has not alleged that Vermont citizens were disenfranchised, that access to the polls was flawed, or that Defendants tainted the election results. Although Act

16

46 contains spending and tax incentives for early mergers, the Act is otherwise silent on local voting. Plaintiff does not allege that the incentives in Act 46, and the local support of the merger in light of these incentives, disturbed access to the polls or otherwise created impediments to voting. Plaintiff has not alleged any "extreme circumstances in which the right to vote was affected." *Daims*, 2016 VT 55, ¶ 17. The Court therefore concludes that Plaintiff has failed to state a claim under Article 8.

Additionally, as discussed above, the Education Clause rests the constitutional obligation for education with the state, and not towns and cities, so the state was not constitutionally required to involve municipalities in school governance restructuring even to the degree that Act 46 allowed. In general, municipalities are subject to the legislative control of the state because they are an arm of the state. *Morse v. Vermont Div. of State Bldgs.*, 136 Vt. 253, 255 (1978) ("As between the state and local units of government, the municipal bodies' power is derivative, based upon an allocation of authority from the state."); *General rule as to legislative control*, 2 McQuillin Mun. Corp. § 4:3 (3d ed.). Accordingly, the legislature may generally compel municipalities to "incur debts or assume obligations" as to matters of state concern. 2 McQuillin Mun. Corp. § 4:154. Although Act 46 permitted local input into the merger process, the Act was not constitutionally required to do so. In other words, the state may not only incentivize municipal action on school governance, but could have compelled the towns and cities to adopt the state's policy without violating the Education Clause.

Plaintiff's citations to state and federal statutes are also unavailing. Plaintiff alleges a violation of 18 U.S.C. § 594. This federal criminal statute prohibits voter intimidation in elections for federal office, and is therefore inapplicable to the local election in this case. Plaintiff also alleges a violation of "U.S. Code 52(b) 'Prohibited Acts.'" See Am. Compl. at 53.

17

As Defendants observe, it appears that Plaintiff is referring to § 11(b) of the Voting Rights Act, also cited by Plaintiff, and codified in Title 52 of the United States Code. See Mot. to Dismiss at 20 n.10; 52 U.S.C. § 10307(b) (containing similar language to "U.S. Code 52(b)," as cited in Am. Compl. at 53). 52 U.S.C. § 10307, formerly 42 U.S.C. § 1973i, prohibits attempts to intimidate, threaten, or coerce citizens for the purpose of interfering with the right to vote. The Texas Supreme Court considered the applicability of this provision in a challenge to a Texas law that gave the Commissioner of Education power to decide school consolidations. *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 741 (Tex. 1995). To avoid mandatory consolidation, residents could vote on alternative options provided by the law. *Id*. at 745. The appellants argued that they did not wish to vote for any of the options, but were coerced to do so to avoid mandatory consolidation in violation of § 1973i. *Id*. The court found not basis for "coercion" under § 1973i:

> We reject the argument that Senate Bill 7 is an unlawful attempt to interfere with the right to vote. As indicated previously, the Texas Constitution gives the Legislature a 'free hand' in establishing school districts, 'including the abolition and consolidation of districts.' Far from interfering with the right to vote, Senate Bill 7 provides an opportunity to vote that would not otherwise exist.

*Id*. (citation omitted). The same could be said in this case as well. As discussed above, Act 46 provides an opportunity to vote that would not otherwise exist, since the Vermont Constitution gives the state control over education. And nothing in the Act attempts to interfere with the right to vote itself. Plaintiff has therefore failed to state a claim under the Voting Rights Act.

Finally, Plaintiff alleges a violation of 17 V.S.A. § 2017, which prohibits a person who attempts by "bribery, threats, or any undue influence" to control a vote. In addition to the rationale above, Plaintiff lacks standing to enforce this statute because "[t]here is nothing in the statute or statutory scheme to suggest a legislative intent to enable its private enforcement."

18

*Bingham v. Town of Middlebury*, No. 2014-478, 2015 WL 2384028, at *1 (Vt. May 14, 2015) (unpub. mem.) (specifically finding no private right of action under 17 V.S.A. § 2017). Accordingly, Plaintiff has failed to state a claim under the federal and state statutes cited by Plaintiff relating to voter coercion or intimidation.

V.      Appeal of Administrative Complaint

Defendants also move to dismiss Plaintiff's appeal of his administrative complaint to the Secretary of State. See Mot. to Dismiss at 26; Am. Compl. at 62-65, 71; Pl.'s Ex. 9 (administrative complaint); Pl.'s Ex. 10 (Secretary of State's dismissal of complaint). Plaintiff filed an administrative complaint with the Secretary of State, alleging the same election law and constitutional violations as discussed above for Act 46's coercive effect on local voters. See Pl.'s Ex. 9. Title 17 establishes a complaint procedure for any person to assert an alleged violation of Title 17 or the federal Help America Vote Act of 2002, and permits those administrative complaints to be appealed to the superior court. See 17 V.S.A. § 2458. The Secretary of State dismissed the complaint, stating that the election in question was not an election as defined by the Secretary of State's administrative regulations because a federal office did not appear on the ballot. See Pl.'s Ex. 10; Vt. Code R. 20-2:4(II)(C) ("'Election' means a primary or general election in which a federal office appears on the ballot."). The Court upholds the Secretary of State's dismissal because, as discussed above, Plaintiff has failed to state a valid claim.

As an initial matter, Defendants argue that this Court should not entertain Plaintiff's appeal because Plaintiff did not file a notice of appeal with the administrative agency within 30 days as required by Vt. R. Civ. P. 74. See Mot. to Dismiss at 27–28. Defendants argue that the failure to file a timely notice of appeal deprives the Court of jurisdiction. Mot. to Dismiss at 28;

19

*In re Town of Killington*, 2003 VT 87A, ¶ 8, 176 Vt. 60 (recognizing that appeals under Rule 74 must comply with V.R.A.P. 4). In this case, however, the Secretary of State dismissed Plaintiff's administrative complaint on September 6, 2017, and Plaintiff filed his original complaint in this Court on September 25, 2017. "If a notice of appeal is mistakenly filed in the superior court, . . . it shall be deemed filed with the administrative body on the date so noted [in the superior court]." Vt. R. Civ. P. 74(b). By filing his complaint on September 25, Plaintiff effectively filed a notice of appeal with this Court within 30 days. See Vt. R. Civ. P. 74(b); *In re Verizon Wireless Barton Permit*, 2010 VT 62, ¶ 22, 188 Vt. 262 ("[T]he trial court should be cautious that the pro se litigant is not 'taken advantage of by strict application of rules of procedure.'"). Accordingly, the Court finds no jurisdictional defect in Plaintiff's appeal.

Administrative appeals under Rule 74 are on the record and not de novo. *In re Soon Kwon*, 2011 VT 26, ¶ 6, 189 Vt. 598 (mem.). The Court's task is to determine whether there was any reasonable basis for the agency's action under a deferential standard of review. *Id*. In this case, the Secretary of State dismissed the complaint because the school merger election did not meet the definition of election under the Secretary of State's administrative regulations. See Pl.'s Ex. 10. There is no dispute that the Secretary of State accurately applied the administrative regulation's definition of election to Plaintiff's complaint. See 20-2 Vt. Code R. § 4(II)(C). Moreover, administrative rules "are presumed valid, based in part on the acceptance of the construction of a statute by an administrative agency that implements it 'absent compelling indication of error.'" *Smiley v. State*, 2015 VT 42, ¶ 27, 198 Vt. 529. The Court is disinclined to uphold the dismissal based on the Secretary of State's rationale, and instead affirms the dismissal for failing to state a claim as explained in this decision.

The enabling statute, 17 V.S.A. § 2458, requires the Secretary of State to adopt rules creating a complaint procedure:

> The secretary of state shall adopt rules to establish a uniform and nondiscriminatory complaint procedure to be used by any person who believes that a violation of this title or any other provision of Title III of United States Public Law 107-252 has occurred, is occurring, or is about to occur. For purposes of this section, "complaint" shall mean a statement in writing made by a voter stating, with particularity, the violation, notarized, and sworn or affirmed under penalty of perjury.

17 V.S.A. § 2458. The complaint procedure can be used by any person who believes a violation of title 17 has occurred. Title 17 includes sections relating to local elections and town meetings. See 17 V.S.A. § 2630–89. The Secretary of State's Election and Campaign Finance Division's administrative regulations defines a complaint as "an allegation in writing that there is a violation of provisions of Title 17 of the Vermont Statutes or Title III of the HAVA that has occurred, is occurring or is about to occur *in an election*." Vt. Code R. 20-2-4:II(A) (emphasis added). In turn, the regulations define "election" as "a primary or general election in which a federal office appears on the ballot." *Id*. at 4:II(C). The administrative rule, as applied by the Secretary of State, limits the scope of the complaint procedure only to elections with a federal office on the ballot. This administrative rule appears to undermine the substantive requirement of 17 V.S.A. § 2458 to provide a complaint procedure for allegations under Title 17 generally, including allegations regarding local elections and town meetings under 17 V.S.A. § 2630–89. See *In re Agency of Admin., State Bldgs. Div.*, 141 Vt. 68, 81 (1982) ("An administrative rule does not violate its enabling statute *so long as the substantive requirements of the statute are not compromised by its language*." (emphasis added)). The Court is therefore disinclined to accept the Secretary of State's basis for dismissing Plaintiff's complaint.

21

Nonetheless, the Court will still "affirm a proper administrative decision even if the grounds stated in its support are erroneous." *Vermont Elec. Power Co. v. Town of Cavendish*, 158 Vt. 369, 374 (1992) (citing *Vermont State Colleges Faculty Fed'n, AFT Local 3180, AFL-CIO v. Vermont State Colleges*, 151 Vt. 457, 463 (1989)). Plaintiff's administrative complaint alleges the same election law and constitutional violations discussed above. Since Plaintiff has failed to state a claim that Act 46 interferes with the right to vote in violation of any these provisions, the Court affirms the dismissal of Plaintiff's administrative complaint for that reason.

<u>Conclusion</u>

For the foregoing reasons, Defendants Motion to Dismiss is GRANTED. Plaintiff has failed to state a claim that Act 46 unconstitutionally usurps local control of schools, violates equal educational opportunities, or affects the right to vote. Plaintiff's appeal of the dismissal of his administrative complaint is affirmed for failing to state a claim as explained in this decision.

This opinion MOOTS all other pending motions in this case.

Dated at Chelsea, Vermont , March 15, 2018

_____

Hon. Michael J. Harris, Presiding Judge